**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **SERGEY GAPONYUK,**<br><br>**Plaintiff,**<br><br>v.<br><br>**EVGENY ALFEROV, SERGEI KOLOSOVSKII, MIHAIL VERSHININ, ALEXANDER CHERNOV, DAVID BROWN, NATALIA ABRAMOVA**<br><br>**Defendants.** | **CASE NO.:**<br><br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND EXPEDITED DISCOVERY WITHOUT NOTICE AGAINST DEFENDANTS** |

Plaintiff SERGEY GAPONYUK, an individual ("**Plaintiff**"), by and through his undersigned attorneys, respectfully submits this memorandum of points and authorities in support of his Motion for entry of a temporary restraining order ("**TRO**") against Defendants EVGENY ALFEROV, SERGEI KOLOSOVSKII, MIHAIL VERSHININ, ALEXANDER CHERNOV, DAVID BROWN, and NATALIA ABRAMOVA and for an Order permitting him to engage in expedited discovery ("**Motion**").

## RELEVANT FACTUAL BACKGROUND

Around May 2022, Plaintiff saw a YouTube advertisement of the CryptoKG crypto exchange platform ("**CryptoKG**") that allowed users to register on the www.cryptokg.io website and begin trading cryptocurrencies. Compl. at ¶ 15. The website www.cryptokg.io is currently unavailable; however, the website www.cryptokg.org is available and is very similar to the www.cryptokg.io website in both appearance and function. *Id.*

1

Around the same time, Plaintiff was approached via Telegram messenger by Defendant Alexander Chernov who used the Telegram handle @alexander_chernov1 and introduced himself as Alexander Chernov ("**Alexander**"). *Id.* at ¶ 16. Alexander began to persuade Plaintiff to deposit money into CryptoKG. *Id.*

Plaintiff initially hesitated to deposit money, but Alexander made multiple calls and sent numerous messages throughout May 2022, and established in Plaintiff a sense of trust and reliability. *Id.* at ¶ 17. Eventually Alexander persuaded Plaintiff to deposit $500 as a starting amount. *Id.* Alexander instructed Plaintiff to invest through a crypto-ATM, which is an ATM that converts cash to Bitcoin ("**BTC**") or other cryptocurrencies and sends it to a specified crypto wallet, generally without an identity check. *Id.*

Around June 10, 2022, Plaintiff sent $408 worth of BTC, after fees, to the wallet address provided by Alexander in order to activate Plaintiff's account and begin trading on CryptoKG. *Id.* at ¶ 18.

On June 13, 2022, Plaintiff was approached via Telegram messenger by Defendant MIHAIL VERSHININ who used the Telegram handle @mihail_vershinin and introduced himself as Mihail Vershinin ("**Mihail**"). *Id.* at ¶ 19.

Mihail told Plaintiff that he represents the analytics department of CryptoKG and that Plaintiff's account at CryptoKG had been activated. *Id.* at ¶ 20.

Mihail communicated with Plaintiff almost daily, guiding him on which buy and sell orders to place using CryptoKG and persuading him to deposit more funds to increase his profits. *Id.* at ¶ 21.

2

*Mihail Persuades Plaintiff to Invest Significant Amounts*

Around July 8, 2022, Plaintiff attempted to send $50,000 from his bank account at Bank of America to his Coinbase account in order to then send the funds from his Coinbase Bitcoin wallet to a Bitcoin wallet allegedly belonging to CryptoKG. *Id.* at ¶ 22. However, these funds were actually transferred to Mihail's wallet

No: bc1qh8dt54yhpyhh4vkefhx82fhzcsyfzxaa60cxmt ("**Mihail's BTC Wallet**"). *Id.*

Bank of America paused the transaction due to possible fraud risks, but Plaintiff persuaded support personnel and informed them that he understood the risks. *Id.* at ¶ 23. Plaintiff then proceeded to send $49,999 worth of Bitcoin from his Coinbase Bitcoin wallet

No: bc1q5nlpk29584228jfrrstjz46n0k5hf4e9ecuums ("**Plaintiff's Coinbase Wallet**") to Mihail's BTC Wallet believing that it was actually being placed in CryptoKG's wallet to be invested and to be available should Plaintiff chose to withdrawal these funds at any time. *Id.*

In late July, Mihail continued to persuade Plaintiff to invest additional funds to increase his balance and profits. *Id.* at ¶ 24. Plaintiff agreed and attempted to make a transfer from Plaintiff's Coinbase Wallet. *Id.*

Coinbase did not allow the transfer to Mihail's BTC Wallet, blocked the transaction as suspicious, and prohibited all crypto transfers from Plaintiff's Coinbase Wallet. *Id.* at ¶ 25. However, through Coinbase, Plaintiff could still receive crypto, convert it to USD and send it to his bank account. *Id.*

After this, Mihail advised Plaintiff to use the MEXC crypto exchange ("**MEXC**"), because it has less stringent security checks. *Id.* at ¶ 26. Plaintiff, relying on Mihail's advice, then set up a MEXC wallet. *Id.*

On July 29, 2022, Plaintiff transferred $37,499 worth of USDT[1] from his MEXC wallet to Mihail's wallet No: TJffP75pNZX9VELgLap9k6zu57DrVvH9iS on the Tron blockchain network[2] ("**Mihail's Tron Wallet**") via transfer from MEXC. *Id.* at ¶ 27.

On August 1, 2022, Plaintiff transferred $134,999 worth of USDT from his MEXC wallet to Mihail's Tron Wallet. *Id.* at ¶ 28.

Around August 5, 2022, Mihail suggested Plaintiff withdraw $10,100 worth of Bitcoin from CryptoKG to his crypto wallet at Coinbase. *Id.* at ¶ 29. Plaintiff then deposited these funds into his bank account. *Id.* This strengthened Plaintiff's belief that CryptoKG was a legitimate crypto exchange platform. *Id.*

Mihail continued advising Plaintiff on which cryptocurrencies to purchase and when to make the purchases. *Id.* at ¶ 30. Mihail instructed him on the exact prices and timing of when to buy and sell using CryptoKG. *Id.* Mihail told Plaintiff to deposit more funds to obtain a "VIP" status on CryptoKG. *Id.*

Mihail's representations to Plaintiff were that these deposits were being placed into accounts belonging to the crypto exchange and that Plaintiff will be able to make significant profit if his deposits increased and that these deposits would be available to withdrawal at any time. *Id.* at ¶ 31. Plaintiff then made three additional transfers to another wallet in the Tron blockchain network controlled by Mihail No: TWBh6KvqEu2pxi93HsboR1QRVZW4MjfWBH ("**Mihail's Tron Wallet 2**", collectively with Mihail's BTC Wallet and Mihail's Tron Wallet,

---

[1] Tether (often abbreviated "USDT") is a cryptocurrency hosted on various blockchains, including Bitcoin, Ethereum, and Tron. It is categorized as a "stablecoin," because it was originally designed so that each coin would always be worth $1.00 USD. Thus, one USDT is worth roughly $1.00; and 37,499 USDT are worth approximately $37,499.00. Tether has one of the largest market caps and is one of the most widely-circulated cryptocurrencies in the world.

[2] There are different blockchain networks, such as Bitcoin blockchain, Ethereum blockchain, Tron blockchain, etc. These networks differ in transactions speed and fees, security, and privacy of participants.

**"Mihail's Wallets"**): (1) $99,999 worth of USDT on August 11, 2022, (2) $49,999 worth of USDT on August 15, and (3) $89,999 worth of USDT on August 26, 2022. *Id.*

As of August 26, 2022, Plaintiff had made deposits to Mihail's Wallets in the amount of $462,902 and had withdrawn $10,100. *Id.* at ¶ 32.

The blockchain transaction history shows that within minutes of receiving funds from Plaintiff, Mihail transferred these funds to either Kuna crypto exchange (a Ukrainian crypto exchange) or Binance (one of the largest crypto exchanges in the world). *Id.* at ¶ 33. See table of the transaction history with destination addresses below ("**Destination Addresses**"): *Id.*

| Destination Address | Amount sent | Date |
|---|---|---|
| bc1qh8dt54yhpyhh4vkefhx82fhzcsyfzxaa60cxmt (Mihail's BTC Wallet) | 2.4 BTC (Received from Plaintiff) | July 15, 2022 |
| 1N8iWg1ARzK4RfstkBcWWif2RN3wMMrWNp (Transit wallet address used by Mihail) | 2.4 BTC | July 15, 2022 |
| bc1qm34lsc65zpw79lxes69zkqmk6ee3ewf0j77s3h (Binance exchange Bitcoin address to which Mihail sent funds) | 4.27 BTC (Additional 1.87 BTC were already on this wallet) | July 15, 2022 |
| TJffP75pNZX9VELgLap9k6zu57DrVvH9iS (Mihail's Tron Wallet) | 37,499 USDT (Received from Plaintiff) | July 29, 2022 |
| TQ5Qtf3vFFR44pmR3GvK3UMvAZCMerNfxQ (Kuna exchange Tron address, to which Mihail sent funds) | 37,499 USDT | July 29, 2022 |
| TJffP75pNZX9VELgLap9k6zu57DrVvH9iS (Mihail's Tron Wallet) | 134,999 USDT (Received from Plaintiff) | August 1, 2022 |
| TQ5Qtf3vFFR44pmR3GvK3UMvAZCMerNfxQ (Kuna exchange Tron address, to which Mihail sent funds) | 134,999 USDT | August 1, 2022 |
| TWBh6KvqEu2pxi93HsboR1QRVZW4MjfWBH (Mihail's Tron Wallet 2) | 99,999 USDT (Received from Plaintiff) | August 11, 2022 |
| TV6MuMXfmLbBqPZvBHdwFsDnQeVfnmiuSi (Binance exchange Tron address used by Mihail) | 99,999 USDT | August 11, 2022 |

| TWBh6KvqEu2pxi93HsboR1QRVZW4MjfWBH (Mihail's Tron Wallet 2) | 49,999 USDT (Received from Plaintiff) | August 15, 2022 |
|---|---|---|
| TV6MuMXfmLbBqPZvBHdwFsDnQeVfnmiuSi (Binance exchange Tron address, to which Mihail sent funds) | 49,999 USDT | August 15, 2022 |
| TWBh6KvqEu2pxi93HsboR1QRVZW4MjfWBH (Mihail's Tron Wallet 2) | 89,999 USDT (Received from Plaintiff) | August 26, 2022 |
| TV6MuMXfmLbBqPZvBHdwFsDnQeVfnmiuSi (Binance exchange Tron address, to which Mihail sent funds) | 89,999 USDT | August 26, 2022 |

### Plaintiff Was Not Able to Withdraw His Funds

In late August, Plaintiff informed Mihail that he needed to withdraw $100,000 from CryptoKG in September for Plaintiff's personal expenses, and Mihail said that this withdrawal was fine. *Id.* at ¶ 34.

On September 7, 2022, Mihail told Plaintiff that to withdraw $100,000, he has to place three buy orders, at $90,000 each. *Id.* at ¶ 35. Otherwise, CryptoKG's financial department will not allow the withdrawal. *Id.*

When Plaintiff was placing the last buy order, his account became blocked. *Id.* at ¶ 36. Mihail said that Plaintiff typed $900,000 instead of $90,000 as the total value of cryptocurrencies to purchase, and his account was automatically blocked due to insufficient funds. *Id.* Mihail said he would arrange a loan from CryptoKG for the Plaintiff and would use around $400,000 of his own funds to help pay for part of the Plaintiff's loan. *Id.*

Around that time, Defendant DAVID BROWN called Plaintiff using Telegram messenger, using the Telegram handle @DB_HeadCrypto, the number +44 7884 798309, and introduced himself as David Brown, head of CryptoKG, and Mihail's boss ("**David Brown**"). *Id.* at ¶ 37.

David Brown directed Plaintiff to pay the insufficient funds during the call. *Id.* at ¶ 38. David Brown stated that half of the $800,000 loan had been paid from Mihail's bonus payments as he was Plaintiff's financial analyst. *Id.*

Mihail then began persuading Plaintiff to pay "his part" of the loan in the amount of around $400,000 to satisfy the loan; otherwise, Plaintiff's funds would be lost forever. *Id.* at ¶ 39. By that time, Plaintiff's balance on CryptoKG was around $3,000,000 as a result of multiple profitable trades prior to blocking, which clearly was more than sufficient to cover the loan. *Id.*

Mihail then told Plaintiff to pay $113,882.98 before September 21, 2022, and then $113,882.97 before September 27, 2022, in order for Plaintiff to retain access to Plaintiff's funds. *Id.* at ¶ 40.

### *Analysis of Defendants' Fraudulent Scheme*

At this point, Plaintiff retained counsel to advise him in this matter. *Id.* at ¶ 41. Research of CryptoKG found multiple reviews indicating that CryptoKG was engaged in fraudulent activity. *Id.* CryptoKG's website contained Terms and Conditions, a Privacy Policy, an AML Policy, and White Paper, all of which mentioned Coinplas Ltd., a company registered in London, UK, on June 18, 2021, and closed by authorities for failure to provide any reports since its registration. *Id.* The director and sole shareholder of Coinplas Ltd. was Joaquin Aranda Romero. *Id.*

Additionally, Crypto KG's Terms and Conditions described the procedures for making deposits and withdrawals. *Id.* at ¶ 42. Nothing in the Terms and Conditions mentioned possible loans from CryptoKG or the inability to withdraw funds due to the loan. *Id.*

Using the email address support@cryptokg.io, Mihail sent Plaintiff a letter of guarantee, dated September 20, 2022, and signed by someone named Bence Marton who was registered

with the Cyprus Securities Exchange Commission under License CN4496. *Id.* at ¶ 43. The letter

of guarantee indicated that Plaintiff could withdraw his funds after payment of $113,882.97. *Id.*

The letter featured the CryptoKG logo at the bottom of the page, the company number of

Coinplas Ltd. on the stamp, and its registered address at the bottom of the page, although

Coinplas Ltd. was not mentioned directly anywhere in the letter. *Id.*

###### *Plaintiff's Demand Letter and Requests*

Through his attorneys, Plaintiff sent a demand letter to CryptoKG's known email

address: support@cryptokg.io and to Mihail's Telegram account. *Id.* at ¶ 44. The demand letter

also mentioned Coinplas Ltd., since this company was mentioned on CryptoKG's website, its

identifying information listed on the letter of guarantee dated September 20, 2022, and at that

time had not been shut down by authorities. *Id.*

CryptoKG did not respond to the email, although the email address was used before and

after the delivery of the demand letter to send notifications to Plaintiff. *Id.* at ¶ 45. Mihail

continued to contact the Plaintiff but did not comment on the substance of the demand letter and

stated that Plaintiff's attorneys are fraudulent and that paying the outstanding loan payment to

Mihail was the only legal way to resolve the issue. *Id.*

When questioned about the legal entity of CryptoKG, Mihail stated that CryptoKG is a

decentralized exchange and is not a legal entity, and that clients' funds are stored on a segregated

wallet, to which neither CryptoKG nor its employees have access. *Id.* at ¶ 46. This representation

contradicts the fact that CryptoKG blocked Plaintiff's ability to withdraw funds from his account

on numerous occasions. *Id.* CryptoKG stated that only the Plaintiff has control over his account

and is the only one with the ability to close his opened positions, yet CryptoKG closed and

annulled Plaintiff's account, as evidenced in an email CryptoKG sent to Plaintiff on October 18, 2022. *Id.*

Plaintiff continued messaging with Mihail to maintain this necessary avenue of communication despite being highly suspicious of Mihail's intentions. *Id.* at ¶ 47.

On October 17, 2022, Plaintiff submitted a withdrawal request for $50,000 from CryptoKG, which was cancelled by CryptoKG. *Id.* at ¶ 48. The same day, Plaintiff submitted another $40,000 withdrawal request, which was cancelled by CryptoKG. *Id.*

Finally, Plaintiff submitted a $100 withdrawal request on October 18, 2022, that was also cancelled by CryptoKG. *Id.* at ¶ 49. As of October 18, 2022, Plaintiff's total CryptoKG account balance was listed as $3,785,791.24. *Id.*

### *New Defendants Contact Plaintiff*

On October 2022, Defendant NATALIA ABRAMOVA contacted Plaintiff via Telegram messenger from the Telegram handle @natalia_abramova7 and introduced herself as Natalia Abramova ("**Natalia**"), which is likely an alias. *Id.* at ¶ 50.

After Natalia made multiple threats to annul Plaintiff's account, Natalia provided Plaintiff with yet another letter of guarantee dated December 13, 2022, signed by a person named Nikos Rentoumis, registered with the Cyprus Securities Exchange Commission under License CN4486. *Id.* at ¶ 51. The signature and the seal are the same as in the previous letter of guarantee dated September 20, 2022. *Id.*

The new letter of guarantee stated that Plaintiff was permitted to withdraw funds if he paid $199,873 to a counterparty, someone named Adrian Bartlett, who was listed as the Plaintiff's trader. *Id.* at ¶ 52. In reality, Adrian Bartlett is not Plaintiff's trader, and this was the first time Plaintiff had ever heard of Adrian Bartlett. *Id.* This information appeared only in the

letter of guarantee. *Id.* Notably, this letter of guarantee specified that $2,985,791.24 was in Plaintiff's Crypto KG account. *Id.*

Natalia repeatedly stated to Plaintiff that she would "sell his account on an auction" and retain the profits herself if Plaintiff failed to pay the demanded amount. *Id.* at ¶ 53.

Natalia repeatedly stated that Plaintiff's account value was equal to $2,985,791.24. *Id.* at ¶ 54.

### *Temporary Restraining Order and Expedited Discovery*

As a result of Defendants' scheme, Plaintiff has lost approximately $3,000,000 and is left trying to uncover where his funds are after they were stolen by Defendants. Given these facts, Plaintiff commenced this action and is entitled to a temporary restraining order freezing Defendants' assets, including the Destination Addresses maintained by Defendants, for them, or by any entity under their control, to preserve the *status quo ante* pending the outcome of this litigation.

Additionally, given the circumstances and this Court's broad discretion in authorizing discovery, especially in regard to preliminary injunctions, expedited discovery is necessary to resolve the issue of whether the temporary restraining order entered by the Court without notice to Defendants should be expanded into a preliminary or permanent injunction with notice to Defendants. Recognizing the limited time available and the challenges involved in discovery, Plaintiff has carefully determined specific types of documents to request from the listed cryptocurrency exchanges through subpoenas. These requests are designed to facilitate the comprehensive, unbiased, and effective gathering of facts required to address the key matters raised in the Complaint.

At this time, Plaintiff's proposed expedited discovery is focused solely on Defendants, specifically their identities and the cryptocurrency wallets and accounts that Defendants owned, operated, or controlled at least in part, as those wallets and accounts pertain to the central issues in dispute in the Complaint and the TRO, which Plaintiff will request be extended into a preliminary or permanent injunction. Plaintiff's efforts to expedite discovery are not related to monetary damages or any issues aside from those that must be resolved at this preliminary stage. The documents and information sought by Plaintiff are required for the Court to properly evaluate whether, after Defendants have been identified, the TRO should be extended into a preliminary or permanent injunction with notice to Defendants.

## ARGUMENT

### I.   Rule 65 Permits Entry of a Temporary Restraining Order Without Notice

Rule 65 permits this Court to enter a temporary restraining order without notice to the adverse parties if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury . . . will result to the movant before the adverse party can be heard in opposition." Fed.R.Civ.P. 65(b)(1)(A). Further, the movant's counsel must certify in writing "any efforts made to give notice and the reasons why it should not be required." Fed.R.Civ.P. 65(b)(1)(B).

As to the first requirement of Rule 65(b)(1), the allegations in the verified Complaint, summarized and cited above, establish the likelihood of immediate and irreparable injury. Plaintiff was clearly victimized by Defendants, who intentionally took advantage of the anonymous nature of the cryptocurrency transactions in order to steal Plaintiff's funds. This significantly inhibits Plaintiff's ability to trace his stolen funds or even identify most of Defendants by their proper legal names.

11

By freezing Defendants' assets, including the Destination Addresses to which Defendants transferred and held any portion of the funds stolen from Plaintiff, Plaintiff will be positioned to recover his stolen cryptocurrency before Defendants can transfer it beyond Plaintiff's reach.

With regard to the second requirement of Rule 65(b)(1), a TRO is warranted without notice to Defendants. Most of Defendants' proper legal names are unknown at this point, and the current addresses of all Defendants are unverifiable. Only through expedited discovery of the cryptocurrency exchanges at which the Destination Addresses are or were maintained might Plaintiff be able to uncover Defendants' names and locations, either physical or electronic, at which they can be apprised of the claims brought against them in this lawsuit so they may defend themselves against those claims, if they so choose.

Furthermore, Plaintiff is concerned that Defendants will move any traceable funds either into untraceable cryptocurrency accounts or to offshore entities organized in unknown locations.

## II.  The Court Can Issue an Injunction to Freeze Assets in This Action for Equitable Relief

Under the general rule, federal courts lack the authority to freeze assets of a defendant before the claims have been brought to judgment. *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 322 (1999). "However, when the plaintiff is seeking equitable relief, as opposed to merely legal remedies, the federal courts have the authority to issue a preliminary injunction in order to freeze the assets of a defendant if the requirements for a preliminary injunction are otherwise satisfied." *Clayton v. Heartland Resources*, Inc., 2008 WL 5046806, at *4 (W.D. Ky. Nov. 21, 2008) (citing *Grupo Mexicano*, 527 U.S. at 324-325); *see also In re Focus Media, Inc.*, 387 F.3d 1077, 1084 (9th Cir. 2004) (citations omitted). In *Focus Media*, the Ninth Circuit held that the rule against injunctive relief as articulated in *Grupo Mexicano* did not apply to the underlying claims for fraudulent conveyance and constructive

12

trust, and ultimately concluded that the trial court's entry of a preliminary injunction had been proper. *Id.* at 1085.

Further, Rule 64 of the Federal Rules of Civil Procedure provides that when state law authorizes a prejudgment remedy to secure assets subject to a plaintiff's state law claims, state law governs such relief. Fed. R. Civ. P. 64; *Granny Goose Foods, Inc. v. Bhd. of Teamsters Local 70*, 415 U.S. 423, 436 n.10 (1974).

Here, Plaintiff seeks equitable relief in addition to his legal remedies and is entitled to an injunction to maintain the status quo until the claims in the Complaint can be resolved. Among other claims and remedies sought, Plaintiff alleges breach of contract, violations of numerous common law torts (conversion, replevin, unjust enrichment) and requests relief in the following form of equity: (1) A judgment awarding Plaintiff equitable restitution, including, without limitation, restoration of the status quo ante, and return to Plaintiff of all cryptocurrency or fiat currency taken from him in connection with the scam perpetrated upon Plaintiff by Defendants, and (2) the equitable imposition of a constructive trust over the property taken from Plaintiff that is currently held by Defendants in the Destination Addresses and entry of an Order that the wrongfully obtained property be restored to Plaintiff.

Additionally, with regard to the claim for imposition of a constructive trust, this Court has authorized equitable injunctive relief to secure the assets subject to the claim. *See e.g. Rumbaugh v. Harley*, No. 2:18-cv-01970-KJM-AC, 2018 WL 4002854, at *9 (E.D. Cal Aug 22, 2018).

In the factually similar case of *Jacobo v. Doe*, this court has awarded the type of preliminary equitable relief sought by Plaintiff here. *See Jacobo v. Doe*, No.

122CV00672DADBAKBAM, 2022 WL 2079766 (E.D. Cal. June 9, 2022) (entering temporary restraining order without notice to defendant whose assets were thereby frozen).

Accordingly, and as further shown below, Plaintiff is entitled to a temporary restraining order.

## III.    A Temporary Restraining Order Is Appropriate to Prevent Immediate and Irreparable Harm

This Court has stated that "the standard governing the issuing of a temporary restraining order is 'substantially identical' to the standard for issuing a preliminary injunction. The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Right to Life of Central California v. Bonta*, 562 F. Supp. 3d 947 (E.D. Cal. 2021) (citations omitted).

As shown below, Plaintiff satisfies each element of this standard.

## IV.    Plaintiff Has a Substantial Likelihood of Success on the Merits of His Claims

The harms alleged in the Complaint make it clear that Plaintiff was victimized by Defendants who, through actual fraud, misappropriation, conversion, theft, and other questionable means obtained Plaintiff's cryptocurrency, which in equity and good conscience Defendants should not be permitted to hold. Accordingly, Plaintiff has asserted claims for: (1) breach of contract, (2) fraudulent inducement, (3) negligent misrepresentations, (4) replevin, (5) conversion, (6) unjust enrichment, and (7) violation of California Penal Code § 496.

Moreover, any cryptocurrency assets held in the Destination Addresses to which Defendants transferred any portion of the funds stolen from Plaintiff must be held in a constructive trust for Plaintiff's benefit, as Defendants are not entitled to the benefit of

14

wrongfully misappropriated, converted, and stolen funds and cryptocurrency assets that were taken from Plaintiff.

In light of the foregoing, there is a high likelihood that Plaintiff will succeed on his claims.

As for Plaintiff's request that a constructive trust be applied, California law provides that "a plaintiff seeking imposition of a constructive trust must show: (1) the existence of a res, meaning property or some interest in property; (2) the right to that res; and (3) the wrongful acquisition or detention of the res by another party who is not entitled to it." *Rumbaugh*, 2018 WL 4002854, at *9, citing *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 909 (9th Cir. 2010). A constructive trust is therefore appropriately established "to right a wrong committed and to prevent unjust enrichment of one person at the expense of another either as a result of fraud, undue influence, abuse of confidence or mistake in the transaction." *In re Fin. Federated Title and Trust, Inc.*, 347 F.3d 880, 891 (11th Cir. 2003).

Because Plaintiff has satisfied each of these elements, success on the merits of Plaintiff's common law claims is very likely.

## V.      Plaintiff Will Suffer Irreparable Harm if Defendants Are Not Enjoined

There is a significant risk that Defendants may dissipate the money stolen from Plaintiff or simply transfer those funds into untraceable cryptocurrency accounts or to offshore entities organized in unknown locations.

Considering the speed with which cryptocurrency transactions are made coupled with the anonymous nature of those transactions, it is imperative to freeze Defendants' assets, including those in the Destination Addresses, to maintain the status quo to avoid dissipation of the digital assets illegally obtained from Plaintiff's cryptocurrency account.

**VI.    There Is Little Prejudice to Defendants if the Temporary Restraining Order Is Entered**

While Plaintiff would be severely prejudiced if Defendants dissipate the funds wrongfully taken from Plaintiff, Defendants face no such prejudice. An order forbidding Defendants from moving Plaintiff's assets will, at worst, delay Defendants from shifting their purloined funds to untraceable cryptocurrency accounts; and at best, will help maintain the status quo for Plaintiff to recover the valuable assets illegally obtained from Plaintiff's cryptocurrency account.

**VII.   Plaintiff Has No Adequate Remedy at Law**

Plaintiff's only remedy to recover the funds fraudulently taken from his account is through his right to equitable relief in the form of an order enjoining the dissipation of assets by Defendants, beginning with the imposition of a constructive trust. A legal remedy for monetary relief alone will not adequately protect Plaintiff's equitable ownership interest in those funds and assets that can disappear with the click of a button.

**VIII.  Entering a Temporary Restraining Order Is in the Public Interest**

The public interest strongly supports the entry of a temporary restraining order here because Defendants' activities are rooted in the deception of their customers and permeated by fraud. The public interest would support a temporary restraining order halting Defendants from deceiving and defrauding their unsuspecting customers, since www.cryptokg.org website still operates and constantly attracts new victims.

Additionally, entering a temporary restraining order would serve the public interest by promoting the objectives of the Financial Crimes Enforcement Network, a division of the U.S. Department of the Treasury, by providing assurance that courts will protect investors' assets

from theft and will aid investors in their recovery of stolen assets when they can be readily

located and traced to specific locations, like the stolen investor assets in this action.

IX.     **The Court Should Exercise Its Broad Discretion, Especially in the Context of a Preliminary Injunction against Defendants, and Allow Expedited Discovery**

In the factually similar case of *Jacobo v. Doe* this court has granted the expedited

discovery sought by Plaintiff here. See *Jacobo v. Doe*, No. 122CV00672DADBAKBAM, 2022

WL 2079766 (E.D. Cal. June 9, 2022) (partially granting motion for expedited discovery for

Defendants legal name, street address, telephone number, and e-mail address).

This Court has broad discretion to manage the timing of discovery, especially where a

request for a preliminary injunction makes it unworkable to wait for the Rule 26(f) conference to

serve discovery requests. *See Hunt v. County of Orange*, 672 F.3d 606, 616 (9th Cir. 2012)

("District courts have broad discretion to manage discovery and to control the course of litigation

. . . ."); *Integra Bank N.A. v. Trans Continental Airlines, Inc.*, 2007 U.S. Dist. LEXIS 7781, *7

(M.D. Fla. Feb. 2, 2007) (Federal Rules of Civil Procedure "expressly provide that a Court may

shorten the time for a party to provide discovery"); *Klay v. All Defendants*, 425 F.3d 977, 982

(11th Cir. 2005) (Court has "broad discretion in managing pretrial discovery matters"), quoting

*Perez v. Miami-Dade Co.*, 297 F.3d 1255, 1263 (11th Cir. 2002); see also, Fed.R.Civ.P. 26(d)

(permitting deviation from normal rule when "authorized ... by order"); *Id*., Advisory Committee

Notes ("This subdivision is revised to provide that formal discovery ... not commence until the

parties have met and conferred as required by subdivision (t). Discovery can begin earlier if

authorized . . . by . . . order . . . This will be appropriate in some cases, such as those involving

requests for a preliminary injunction . . . ). The Federal Rules of Civil Procedure contemplate

that discovery may be expedited in appropriate circumstances. Fed.R.Civ.P. 30(a)(2)(A)(iii),

33(a), 33(b)(2), 34(b), and 45. Expedited discovery is particularly appropriate in the preliminary

injunction context. This Court stated that, "[g]ood cause for expedited discovery is frequently found in cases involving claims [] where the plaintiff seeks a preliminary injunction." *First Time Videos, LLC v. Doe*, No. CIV S-12-621 GEB EFB, 2012 WL 1355725, at *3 (E.D. Cal. Apr. 18, 2012); *See, e.g.*, *Fimab-Finaziaria Maglificio Biellese Fratelli Fila Sp.A. et al. v. Helio Import/Export, Inc.*, et al., 601 F. Supp. 1, 3 (S.D. Fla. 1983); *Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841 (D. D.C. 1996). Such discovery "better enables the court to judge the parties' interests and respective chances for success on the merits." *Educata Corp. v. Scientific Computers, Inc.*, 599 F. Supp. 1084, 1088 (D. Minn.) (granting expedited discovery), aff'd in part and appeal dismissed in part, 746 F.2d 429 (8th Cir. 1984). Motions for expedited discovery are appropriate where the movant demonstrates a need to obtain inspection of documents in a shortened time period. *See Integra Bank N.A.*, 2007 U.S. Dist. LEXIS 2007 at *7-8.

Moreover, "[c]ourts allow discovery to identify [anonymous] defendants, and courts allow expedited discovery where good cause is shown." *Pioneer Hi-Bred Int'l, Inc. v. Does*, Case No. 12-06046-cv-SJ-DGK, 2012 WL 12910607, at *1 (W.D. Mo. May 18, 2012) (granting expedited discovery from non-party to identify Doe Defendants' identities). "Under the good cause standard, the party requesting expedited discovery must show that the need for expedited discovery, in consideration of [the] administration of justice, outweighs prejudice to [the] responding party." *Monsanto Co. v. Woods*, 250 F.R.D. 411, 413 (E.D. Mo. 2008). In *Criswell v. Boudreax*, Case No. 1:20-cv-01048-DAD-SAB, 2020 WL 5235675 (E.D. Cal. Sept. 2, 2020) (Drozd, J.), this Court articulated the good cause standard as follows: In determining whether good cause exists, courts consider: (1) whether a preliminary injunction is pending, (2) the breadth of the discovery request, (3) the purpose for requesting the expedited discovery, (4) the burden on the defendants to comply with the requests, and (5) how far in advance of the typical

discovery process the request was made. *Id.* at *25 (citing *Rovio Entm't Ltd. v. Royal Plush Toys, Inc.*, 907 F.Supp.2d 1086, 1099 (N.D. Cal. 2012)). *See also*, *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002); *Kaur v. City of Lodi*, Case No. 2:14-cv-0828 GEB AC, 2014 WL 2154483, at *1 (E.D. Cal. May 22, 2014) ("[A] court may authorize early discovery 'for the parties' and witnesses' convenience and in the interests of justice.'"). As mentioned previously, this Court has stated that, "[g]ood cause for expedited discovery is frequently found in cases involving claims [] where the plaintiff seeks a preliminary injunction." *First Time Videos*, 2012 WL 1355725, at *3. Here, Plaintiff also seeks a preliminary injunction.

In several cases, this Court has applied the standard of good cause in granting a plaintiff's request for expedited discovery, finding that good cause may be found where the need for expedited discovery, in consideration with the administration of justice, outweighs the prejudice to the responding party. *See*, *e.g.*, *Criswell*, 2020 WL 5235675 at *26 (authorizing expedited discovery); *AF Holdings, LLC v. Doe*, Case No. 2:12-cv-2207-KJMDAD, 2012 WL 6608993, at *1-2 (E.D. Cal. Dec. 18, 2012) (Drozd, J.) (concluding requested expedited discovery is appropriate); *Quad Int'l, Inc. v. Doe*, Case No. 2:12-cv-2336-GEB-KJN, 2012 WL 5355565 (E.D. Cal. Oct. 30, 2012) (granting application for leave to conduct early discovery); *Berlin Media Art E.K. v. Does 1 through 146*, Civ. No. S-11-2039-KJM-GGH, 2011 WL 4056167 (E.D. Cal. Sept. 12, 2011) (same).

## X.     Plaintiff Needs Information from Non-Parties to Identify Defendants

Plaintiff needs the Recipient Cryptocurrency Exchanges listed above to identify each of the named Defendants, i.e. obtain their real names, physical addresses, and mailing or contact addresses, so Plaintiff can properly name them in this lawsuit and provide them due notice before requesting that the Court extend the TRO into preliminary and permanent injunctive relief.

Plaintiff also needs to conduct an urgent investigation of all Recipient Cryptocurrency Exchange accounts held by, for, or on behalf of Defendants to identify where Plaintiff's funds have been transferred. To the extent Defendants have already disposed of any of Plaintiff's assets, Plaintiff can serve a subpoena on any other cryptocurrency exchange, wallet operator, or financial institution to which those assets have been transferred in a further effort to freeze them before they are moved again or liquidated in their entirety.

In light of the foregoing, Plaintiff submits narrowly-tailored requests to each Recipient Cryptocurrency Exchange that will provide him with the valuable information he needs to identify Defendants and protect his interests as well as his assets while affording Defendants notice of this action. The requested information includes documents from each Recipient Cryptocurrency Exchange concerning the Defendants' accounts, transactions, trades, associations with other accounts, and the Defendants' personal information.

Certain information, particularly Defendants' true identities, is within the Recipient Cryptocurrency Exchanges' sole possession, custody, and control or within the control of other third parties who will be identified in discovery.

Expedited discovery in this case would help streamline the proceedings, preserve the resources of both the parties involved and the Court, and contribute to a quicker resolution of the case. Importantly, this request for expedited discovery is would not harm or disadvantage Defendants.

## XI.   Good Cause Exists to Allow Expedited Discovery to Identify Defendants

Here, Plaintiff meets the "good cause" standard. Plaintiff is specifically requesting a limited scope of discovery, adhering to the guidelines set by this court. This request is necessary because the information crucial for identifying Defendants and addressing the factual and legal matters before the Court is being held by the Recipient Cryptocurrency Exchanges. The aim is to

obtain the relevant information that is within their possession, custody, and control. Plaintiff holds a reasonable belief that, with the passage of time, Defendants will likely disperse any funds held in their currently identified cryptocurrency wallets and accounts. This action would effectively make it impossible for Plaintiff to access both Defendants and the evidence associated with them.

The burden on the Recipient Cryptocurrency Exchanges and related non-parties in having to respond to the discovery requests is minimal, as all of the documents and information sought should be readily accessible by the Recipient Cryptocurrency Exchanges. Similarly, the burden on Defendants would actually serve to fulfill Defendants' right to due process in defending themselves, once they appear in this matter, against the claims of theft and conversion that have been alleged against them. Lastly, although the request is being made in advance of the typical discovery process, it is only being made because Defendants' true identities are still unknown and because Plaintiff reasonably fears that Defendants will dissipate Plaintiff's stolen cryptocurrency assets in an effort to put those assets, and evidence of the location where they were ultimately transferred, out of Plaintiff's reach.

Because application of the ordinary discovery timetable would not properly suit the parties in light of Defendants' unknown identities, the allegations posed by Plaintiff's Complaint, and because good cause exists to permit a limited round of discovery related to the issues raised by the Complaint, the Court should issue an Order directing expedited discovery.

## **CONCLUSION**

For the foregoing reasons, Plaintiff SERGEY GAPONYUK respectfully requests that this Court find Plaintiff has satisfied the elements of his claim for preliminary injunctive relief and that the Court (1) enter a temporary restraining order without notice to Defendants EVGENY

ALFEROV, SERGEI KOLOSOVSKII, MIHAIL VERSHININ, ALEXANDER CHERNOV,

DAVID BROWN, and NATALIA ABRAMOVA, and (2) enter an Order authorizing expedited

discovery.

Date: July 5, 2023                                    **KUGELMAN LAW, PC**

                                                      By:_____

                                                      Alex Johnson
                                                      ajohnson@kugelmanlaw.com
                                                      21 Tamal Vista Blvd
                                                      Suite 202
                                                      Corte Madera, CA 94925
                                                      *Attorneys for Plaintiff*

                                                      **BUZKO KRASNOV**
                                                      Filipp Petkevitch
                                                      filipp.petkevitch@buzko.legal
                                                      Evgeny Krasnov
                                                      evgeny.krasnov@buzko.legal
                                                      228 Park Ave S
                                                      PMB 85451
                                                      New York, NY 10003
                                                      *Attorneys for Plaintiff*